UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YUSUFALI F. MUSAJI,

                        Plaintiff,

      -against-                        10 Civ. 8541 (RJH)

                                      **MEMORANDUM OPINION**
BANCO DO BRASIL, LUIZ BOMFIM, and       **AND ORDER**
CANDIDA PINTO,

                        Defendants.

Richard J. Holwell, District Judge:

       Plaintiff *pro se* Yusufali F. Musaji commenced this action alleging discrimination on the basis of race, national origin, age, and religion, by filing a complaint in New York Supreme Court on October 20, 2010. Defendants Banco do Brasil, Luiz Bomfim, and Candida Pinto removed the action to this Court on November 12, 2010, on the basis of this Court's federal-question jurisdiction over Musaji's claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.* Now before the Court is defendants' motion to dismiss or alternatively, for partial summary judgment on most of Musaji's claims and Musaji's cross-motion to remand to state court.[1] For the reasons that follow, defendant's motion to dismiss is GRANTED, and Musaji's motion is DENIED.

---

[1] Defendants do not challenge Musaji's Title VII religious-discrimination claim on their motion to dismiss.

1

## BACKGROUND

The following facts are taken as true for the purposes of this motion.

Musaji, a fifty-six-year-old practicing Muslim of Kenyan origin, was hired as a Senior Information Technology (IT) Auditor by Banco do Brasil on March 29, 2008, and was assigned to Banco do Brasil's New York City branch office. (*See* Compl. ¶¶ 1, 5, 11.3.) At that office, defendant Bomfim is the manager of internal audits, and defendant Pinto is the manager of human resources. (*Id.* ¶¶ 3, 4.)

On April 15, 2008, Bomfim instructed Musaji to use only his middle initial instead of his full middle name, Fidahussein. (*Id.* ¶ 6.) Around the same time, Musaji was scheduled to go to Brasilia, Brazil to attend Banco do Brasil's yearly internal audit meeting. (*Id.*) Musaji's flight was to leave from JFK, and "Bomfim made [Musaji] use a local bus from his home and then airport shuttle from Newark Airport to JFK," which cost $60 instead of the $80 it would have cost to take a taxi. (*Id.*) Bomfim informed Musaji that "only Brazilian Managers were expected to use taxis and employees like [Musaji] who were not Brazilian were expected to use local transportation such as an airport shuttle or buses." (*Id.*) When Musaji complained that he was not being "treated in the same manner as the other Brazilian was" in that he had to use personal funds for local transportation and be reimbursed later instead of using a corporate credit card to pay, Bomfim told Musaji that he should, because of his age, consider other employment opportunities not requiring as much travel. (*Id.*) Also in April 2008, Bomfim commented that it was "unsafe to have Muslims around" to his assistant in Musaji's presence. (*Id.* ¶ 7.)

In September 2008, Musaji requested permission from Bomfim to leave work early to attend sunset prayers for his wife's recently-deceased uncle. (*Id.* ¶ 9.) Bomfim granted the request, but replied "that if Muslim men stood sideways during prayers, it would appear that they

2

were 'fucking each other,'" and that "they do that to everyone else also." (*Id.*)  Bomfim also received a traffic citation that month and remarked to another staff member in Musaji's presence that "he could not understand why the police would pick on him just because he looked like an Arab," and that "those bloody Muslim terrorists got everyone to be suspects." (*Id.* ¶ 10.) Turning to Musaji, Bomfim added, "And now I have you in the midst of all this.  You could land me in jail instead of just a ticket." (*Id.*)  When Musaji asked Bomfim why he made anti-Muslim comments, Bomfim told him that if he "did not like the anti-Muslim comments, 'he was not one of them,' and Banco Do Brasil was not an employer for him." (*Id.* ¶ 11.5.)

The complaint contains other general allegations of discrimination.  Musaji alleges, for example, that he always had to use his personal funds on business trips and be reimbursed later instead of being able to use a corporate credit card, and that "[t]he other Bank employee of Brazilian origin was provided corporate credit cards or funds." (*Id.* ¶ 11.2.)  Bomfim also "always referred to [Musaji] as a Poor Muslim from a poor Country" and "expected [Musaji] to live below the standards that" Banco do Brasil's "travel policy allowed." (*Id.* ¶ 11.3.)  Bomfim told Musaji that "since [he] was from third world countries, he should know how to leave [sic] cheaply" and "would get angry . . . if [Musaji's] expenses were not cheap." (*Id.*)  Bomfim also advised Musaji that "only the Brazilian nationals could be promoted to the level of management." (*Id.* ¶ 11.4.)  Apparently, this policy was not uniform, as Anna Maria Santos, who was white and of Portuguese descent, became deputy manager. (*Id.*)  Musaji was not promoted when audit manager positions became available, and when he asked Bomfim why Banco do Brasil "had promoted a Portuguese national to deputy manager in New York and yet told [Musaji] that the bank policy only promoted Brazilian nationals, Bomfim told [him] that [he] was too old." (*Id.*)

In addition, the complaint details incidents that purport to reflect Santos's discrimination against Musaji. First, Santos asked Musaji not to use the toilet next to Bomfim's office "because it was only reserved for managers who happen to be all Brazilians." (*Id.* ¶ 11.5) When Musaji complained about "such petty practices as having to convert each receipt that was in British pound to dollar" to be reimbursed for expenses, Santos "said that remark would go in [Musaji's] personal file for being insubordinate to the Brazilian managers." (*Id.*) When Musaji complained about not having been given a corporate credit card, Santos told him that "he was not Brazilian and therefore not subject to the same privileges as the Brazilian [sic] were" and that Banco do Brasil "had done him a favor because no one else would hire [him] because he was too old by American standards and Bomfim could see that also." (*Id.*)

Musaji and another IT auditor, Lilliana Caye Daudt, went on a business trip to London from September 22, 2008 to October 5, 2008. (*Id.* ¶ 11.) This overlapped with the Muslim holy month of Ramadan, which ran from September 1, 2008 to September 30, 2008. (*Id.* ¶ 12.) During this trip, both Musaji and Daudt were required to work on the weekdays, but had weekends free. (*Id.* ¶ 13.) Initially, both IT auditors were given accommodations at the City Hotel in London, but Daudt, who is Brazilian, did not check in there "because she felt it was in an ethnic and lower class background and believed that she did not have to stay there." (*Id.* ¶¶ 14, 15.) In contrast, Bomfim required Musaji to stay at the City Hotel, whose price was well under the amount allowable for lodging in London under Banco do Brasil's travel and expense policy. (*See id.* ¶ 17.) During the weekends, Musaji stayed at People, "a Muslim lodging place similar to a bed and breakfast, located near a mosque" in London. (*Id.* ¶ 18.) By doing so, he "was able to perform the required religious prayers and fasting during the weekends of the month of Ramadan." (*Id.*)

When Musaji and Daudt returned from their trip, they submitted reimbursement forms for their London expenses.  (*Id.* ¶ 19.1.)[2]  Daudt told Musaji that she was not required to submit receipts and was simply given the per diem amount.  (*Id.*)  In contrast, Musaji was required to submit receipts supporting his expenses in October 2008, even though his submitted expenses were less than the per diem rate.  (*Id.* ¶ 19.2.)  On November 3, 2008, Bomfim and Pinto terminated Musaji's employment on the basis that his expense receipts from London were fraudulent.  (*Id.* ¶ 20.)  Musaji was called into the Human Resources office and provided with a letter explaining his termination, which informed him that "the appearance of the receipts and the hand written notes on the receipts" from People and his "use of locations that are not customarily used by bank employees when traveling to London . . . led the Bank to conduct an investigation of [his] receipts" and concluded that Musaji had submitted "receipts that are not verifiable and that reflect non-existent business locations," violating company standards.  (*See id.* ¶ 20 at 15-16.)  Musaji thereafter applied and received unemployment insurance; in the course of doing so, he responded to his employer's allegations by asserting, among other things, that he did not exceed the per diem rate, that People was a legitimate business, and that he was not apprised of the applicable employer standards that he purportedly violated.  (*See id.* ¶ 20 at 17-21.)

Musaji then filed a complaint with the New York City Commission on Human Rights (the "Commission"), who "found no probable cause of discrimination on the basis of religion." (*Id.* ¶ 20 at 21.)  The Equal Employment Opportunity Commission ("EEOC") thereafter issued a right-to-sue letter "based on this charge," which adopted the findings of the Commission.  (*Id.*; Asen Aff. Ex. E.)  Musaji then brought this action on October 13, 2010, alleging violations of Title VII, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and

---

[2] There are two paragraphs in the Complaint labeled paragraph 19.  For clarity's sake, the Court refers to the first paragraph 19 as 19.1 and the second as 19.2.

the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.* (*Id.* ¶¶ 21-25.) Defendants thereafter removed the action to this Court and brought their motion to dismiss, or in the alternative, for summary judgment on January 5, 2011. Plaintiff opposed the motion and cross-moved for a remand to state court on February 14, 2011.

## DISCUSSION

### I. Motion to Remand

The Court first addresses Musaji's motion to remand to state court. Apparently troubled by the possibility that this Court might dismiss his claims as barred by the statute of limitations, Musaji argues that "because the plaintiff still has until November 2011 (3 years in the New York State Court) before the statute of limitations kicks in," the Court should remand this case to state court. (Pl.'s Opp'n at 15.)[3]

Musaji's argument fails, however, because it is both irrelevant and untimely. It is irrelevant because this Court is bound by a state's highest court's interpretation of that state's law, and applies the same statute of limitations with respect to state-law claims as would the state court. *See, e.g.*, *Runner v. New York Stock Exch.*, 568 F.3d 383, 386 (2d Cir. 2009) ("[O]ur role as a federal court sitting in diversity is not to adopt innovative theories that may distort established state law. Instead we must carefully predict how the state's highest court would resolve the uncertainties that we have identified."). It is also irrelevant because defendants have not made any argument based on the statute of limitations. Instead, defendants have argued that most of Musaji's claims are barred by New York's election-of-remedies provision, by the administrative-exhaustion requirement of Title VII, and binding case law barring suits against individuals under Title VII. It is untimely because Musaji made his motion on February 14,

---

[3] Musaji filed both a three-page letter and a twenty-one page memorandum in opposition to defendants' motion to dismiss. References to his opposition are to the latter.

2011, well after the thirty-day time limit for motions to remand to state court on bases other than subject-matter jurisdiction.  *See* 28 U.S.C. § 1447(c) ("A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a)."). Accordingly, that motion is denied.

## II. Standard of Review for Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). If the factual averments permit no reasonable inference stronger than the "mere possibility of misconduct," the complaint should be dismissed. *Starr*, 592 F.3d at 321 (quoting *Iqbal*, 129 S. Ct. at 1950). Thus, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557). In applying this standard of facial plausibility, the Court takes all "factual allegations to be true and draw[s] all reasonable inferences in the plaintiff's favor. *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). But the Court does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Iqbal*, 129 S. Ct. at 1949.

"[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Accordingly, "the submissions of a *pro se* litigant must be construed liberally and

interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (internal quotation marks and emphasis omitted).

### III. Election of Remedies

The NYCHRL provides:

> Except as otherwise provided by law, any person claiming to be aggrieved by an unlawful discriminatory practice . . . shall have a cause of action in any court of competent jurisdiction . . . , unless such person has filed a complaint with the city commission on human rights or with the state division of human rights with respect to such alleged unlawful discriminatory practice or act of discriminatory harassment or violence.

N.Y.C. Admin. Code § 8-502(a). This provision "preclude[s] a claimant who has filed a complaint with any local human rights agency from pursuing the same claims in a judicial forum." *Petrisch v. JP Morgan Chase*, --- F. Supp. 2d ----, 2011 WL 167629, at *13 (S.D.N.Y. Jan. 11, 2011); *Jackson v. NYS Dep't of Labor*, 709 F. Supp. 2d 218, 225 (S.D.N.Y. 2010). "This bar applies even when the complainant is uncounseled and ignorant of the effects of the election of an administrative forum." *Wiercinski v. Mangia 57, Inc.*, No. 09-CV-4413 (ILG), 2010 WL 2681168, at *2 (E.D.N.Y. July 2, 2010) (citing *Magini v. Otnorp, Ltd.,* 579 N.Y.S.2d 669, 670 (N.Y. App. Div.1992)). Musaji's own complaint in this action alleges that his complaint before the Commission was dismissed for lack of probable cause. (Compl. ¶ 20, at 21.) The Commission's actual decision corroborates that allegation.[4] (Asen Aff. Exs. B, C, D.) And "plaintiff has not alleged, and the court does not find, any exception to the election of remedies rule applicable here because plaintiff's administrative claim[] for discrimination . . .

---

[4] A court may consider these documents on a motion to dismiss without converting the motion to one for summary judgment. *See Morris v. David Lerner Assocs.*, 680 F. Supp. 2d 430, 436 (E.D.N.Y. 2010) (noting that in a 12(b)(6) motion that "with respect to administrative filings (such as the NYSDHR and the EEOC) and decisions, the Court may consider such documents because they are public documents filed in state administrative proceedings, as well as because they are integral to plaintiff's claims").

8

w[as] dismissed on the merits, specifically on a finding of 'no probable cause.'" *McDonald v. City of New York*, --- F. Supp. 2d ----, 2011 WL 1331504, at *22 (E.D.N.Y. Apr. 6, 2011).

Thus the doctrine clearly applies to bar Musaji's NYCHRL religious-discrimination claim, which was alleged before the Commission. Although Musaji's NYCHRL race, national-origin, and age discrimination claims were not asserted before the Commission, "[t]he election-of-remedies bar is not limited to the precise claims brought in the administrative proceeding, but extends to all claims arising out of the same events." *Wiercinski*, 2010 WL 2681168, at *2. And a plaintiff merely asserting a new legal theory in front of a court based on the same underlying conduct alleged at the Commission is barred from the judicial remedy sought. *See, e.g.*, *Bhagalia v. State*, 644 N.Y.S.2d 398, 399 (N.Y. App. Div. 1996) ("Claimant cannot avoid the jurisdictional bar by merely adding additional elements of damage arising out of the same underlying conduct, by changing his legal theory or by couching his claim in such vague and conclusory terms as to thwart comparison of the administrative and legal proceedings."); *Craig-Oriol v. Mount Sinai Hosp.*, 607 N.Y.S.2d 391, 391 (N.Y. App. Div. 1994) ("The plaintiff subsequently brought this action against the defendant, alleging that she had been instead the victim of *racial* discrimination on her job. The plaintiff is barred from maintaining this action because she has already pursued a statutory claim of [age-based] employment discrimination encompassing the same allegedly invidious behavior on the part of her employer over the same period of time."); *Horowitz v. Aetna Life Ins.*, 539 N.Y.S.2d 50, 52 (N.Y. App. Div. 1989) (affirming dismissal of plaintiff's cause of action to recover damages for the intentional infliction of emotional distress as precluded by the election-of-remedies provision since they were only "slightly different labels of intentional infliction of emotional distress and prima facie tort"). "The question is whether a sufficient identity of issue exists between the complaint before the

division and the instant claim." *Spoon v. Am. Agriculturalist, Inc.*, 478 N.Y.S.2d 174, 175 (N.Y. App. Div. 1984).

Here, Musaji's complaint contains many of the same factual allegations asserted before the Commission. Both his complaint here and his complaint before the Commission, for example, allege that: Bomfim instructed him to use only his middle initial; Bomfim made anti-Muslim remarks in April and September 2008; and that Musaji was treated differently than his colleague on their London trip in September and October 2008 with respect to reimbursement procedures and ability to change accommodations because of his religion. It is true that Musaji's complaint in this action adds some new factual allegations that cover the same time period involved in his Commission complaint, such as his difficulties in a trip to Brazil and allegations regarding Santos, but "[t]he facts need not be perfectly identical, and merely adding some additional facts and/or re-labeling the claim will not prevent the application of the doctrine of election of remedies." *Saunders v. NYC Dep't of Educ.*, No. 07 CV 2725 (SJF)(LB), 2010 WL 2816321, at *8 (E.D.N.Y. July 15, 2010); *accord Hamilton v. Niagara Frontier Transp. Auth.*, Nos. 00-CV-300SR, 00-CV-863SR, 2007 WL 2241794, at *11 (W.D.N.Y. July 31, 2007) ("Plaintiff may not circumvent his selection of the NYSDHR as the forum for his complaints by presenting additional facts or defendants in this proceeding."). Accordingly, Musaji is subject to the NYCHRL's election-of-remedies provision on his race, national-origin, and age discrimination claims as well.[5]

---

[5] To the extent Musaji also asserts state-law claims, N.Y. Exec. Law § 297(9) would operate to bar those claims from being heard by this Court as well. *Jackson*, 709 F. Supp. 2d at 224-25 (noting that, compared to N.Y. Exec. Law § 297(9), the "NYCHRL 'language . . . is nearly identical . . . and discussion of the latter applies equally to the former.'" (quoting *York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 127 (2d Cir. 2002))).

### IV. Administrative Exhaustion

Next, defendants argue that Musaji's Title VII race and national-origin discrimination claims, as well as his ADEA claim are barred by Musaji's failure to exhaust administrative remedies. In Title VII and ADEA claims, "[e]xhaustion is ordinarily 'an essential element'" of the claim. *Williams v. New York City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (quoting *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001)) (Title VII); *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1208 (2d Cir. 1993) (ADEA). In this context, "exhaustion" means that "a plaintiff typically may raise in a district court complaint only those claims that either were included in or are 'reasonably related to' the allegations contained in her" administrative charge. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 83 (2d Cir. 2001) (quoting *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993)); *see also Marshall v. NYC Bd. of Elections*, 322 F. App'x 17, 18 (2d Cir. 2009) (applying administrative-exhaustion doctrine to a complaint filed with the Commission); *Bailey v. Frederick Goldman, Inc.*, No. 02 Civ. 2429 (TPG), 2003 WL 22227958, at *1-2 (S.D.N.Y. Sept. 26, 2003) (same).

The Second Circuit has recognized three ways, sometimes called the three "*Butts* exceptions," that a claim can be "reasonably related to" the allegations in the EEOC charge. First, "a claim is considered reasonably related if the conduct complained of would fall within the scope of the [agency's] investigation which can reasonably be expected to grow out of the charge that was made." *Williams*, 458 F.3d at 70. "The central question is whether the complaint filed with the [agency] gave that agency 'adequate notice to investigate discrimination on [the] bases'" alleged in the complaint. *See Williams*, 458 F.3d at 70 (quoting *Deravin v. Kerik*, 335 F.3d 195, 202 (2d Cir. 2003)). Second, a claim is reasonably related if it "alleg[es] retaliation by an employer against an employee for filing an" administrative charge with the

Commission or the EEOC. *Williams*, 458 F.3d at 70 n.3. Third, a claim is reasonably related if it "alleges further incidents of discrimination carried out in precisely the same manner alleged in the . . . charge." *Id.*

Here, Musaji did not mention his age, race, or national origin in his complaint before the Commission, let alone allege discrimination based on any one of those characteristics. As such, these claims were neither included in, nor reasonably related to, his complaint before the Commission. *See, e.g.*, *Marshall*, 322 F. App'x at 18 ("In neither Marshall's initial letter to the [Commission], nor her administrative charge, did she make any allegation that she was discriminated against on the basis of her religion, nor did she include any incidents that would have allowed the [Commission] to investigate such allegations. Accordingly, her religious discrimination claim was not reasonably related to her charge of race and gender discrimination."). Nevertheless, Musaji opposes dismissal on the grounds that a miscommunication between him and a staff attorney at the Commission led to his complaint failing to include the charges of race, national-origin, and age discrimination. (Pl.'s Opp'n at 13-15.) Musaji cites no cases in support of his argument, nor has the Court's search revealed any. In essence, Musaji seeks to craft another exception to the administrative-exhaustion rule for cases in which a miscommunication with an attorney results in certain charges being omitted from the administrative complaint. Even if the Court could add further exceptions to the administrative-exhaustion requirement, however, it would be inappropriate to do so here. The rule's purpose is "to avoid unnecessary judicial action by the federal courts by giving the administrative agency the opportunity to investigate, mediate, and take remedial action." *Saunders*, 2010 WL 2816321, at *7. If the Court were to allow Musaji's claims to proceed here,

where he did not assert race, age, or national-origin discrimination claims, or at least something reasonably related to them, before the Commission, that purpose would be subverted.

Accordingly, Musaji's Title VII race and national-origin claims, as well as his ADEA claim, are dismissed.

## V. Individual Liability

Finally, defendants move to dismiss Musaji's Title VII claims against defendants Bomfim and Pinto. The Second Circuit has "determined that the remedial provisions of Title VII . . . do not provide for individual liability." *Spiegel v. Schulmann*, 604 F.3d 72, 79 (2d Cir. 2010). Musaji argues that the Title VII claims against Bomfim and Pinto should not be dismissed "because although the Banco do brasil [sic] is a legal person, it needs its 'human persons' whom it has entrusted to carry out its responsibilities." (Pl.'s Opp'n at 19.) But this Court is not at liberty to discard binding precedent, including the Second Circuit's analysis of Title VII's statutory scheme in *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313-14 (2d Cir.1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998), which found that Title VII does not provide for individual liability. Accordingly, the Title VII claims against Bomfim and Pinto are dismissed.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss **[6]** is GRANTED. Musaji's race, national-origin, and age discrimination Title VII and city-law claims are dismissed, as are his Title VII claims against Bomfim and Pinto. Musaji's cross-motion to remand **[8]** is DENIED.

SO ORDERED.

Dated: New York, New York
     June 21, 2011

                                            Richard J. Holwell
                                       United States District Judge